Good afternoon, here for argument in Garcia v. Google. Counsel ready? You may proceed. Good afternoon, Your Honors. May it please the Court, Chris Arment on behalf of Plaintiff and Appellant Cindy Lee Garcia. I plan to speak for nine minutes, reserving six for rebuttal. We are here today to challenge the district court's denial of Ms. Garcia's motion for preliminary injunction. It was based on her copyright claim to a film entitled Desert Warrior, and the harm she's threatened with as a result of the publication of this film, albeit distorted into a YouTube sensation called The Innocence of Muslims, which garnered global attention after the attacks in Benghazi and protests around the world. The district court erred on two significant grounds. First, it held that she did not make an independent copyrightable contribution because she was a little person and not the mastermind of the film, and that even if her theatrical, dramatic performance was copyrightable, she necessarily impliedly licensed her performance to the producer to do whatever he wanted with it. The district court's decision suggests the judge was confused about the film properties in question and clearly disregarded the precedent of this court. First of all, Ms. Garcia participated in a benign, nonreligious desert adventure film called Desert Warrior. Well, if she has a claim, why doesn't every actor in a movie or every extra in a movie have a claim saying, you know, the film that they actually produced and put out in the public isn't at all what I had in mind? It was, you know, I thought it was a very different project and I would never have, I mean, you can't have everybody have a copyrighted interest. I mean, have you ever seen those, waited for all the credits to scroll? If everybody there had a copyright, you could never get a movie done. Actually, Your Honor, I don't think that's correct. I think the Copyright Act does not differentiate between whether you have a lead role or a minor role, and that is why most reputable studios, all reputable studios, have almost everyone that participates in a film sign an actor or a model release, relinquishing all their rights, whether for that film or derivative rights, to be placed in any other property. But that's not what happened here. She didn't sign a release. She, under the rule of the circuit, under effects associates, auto versus res, FOA consulting, her license is limited by her intent. So her implied license to participate in Desert Warrior is, again, to be interpreted by the circumstance of the case. Here it's uncontroverted that she responded to a casting call. Is she claiming that she had no written license, that there was no written license? There's no written license. The only license that appeared in this court very late in the game, a couple of days before the preliminary injunction hearing and without leave of court, was two documents that were purportedly signed by Ms. Garcia, which she disavows having signed, which were put into the court without a request for relief to sign late papers, and which a renowned handwriting expert has opined unequivocally that she was not the signer of those documents. Counsel, if I could ask you a question. What bothers me on this case is just trying to understand why does she have a copyright license in the first case? Now, I know that in that effects associates case, which I think the chief judge wrote an opinion on, there was a copyright license implied. But in that case, the company had produced footage itself and then sort of handed it over to the movie. So I guess it clearly had a copyright. I think that's right. In this case, why does she, when she goes to work for the producer who's making this movie, why does she get a copyright in what's produced? Once she delivers her dramatic performance under the Copyright Act, it's affixed to a tangible medium expression. A copyright interest is created in that particular piece of work under Section 101. Now, in effects, they had created the footage separately and imported it into the film, which was the subject that was actually being made. In her case, she delivers her dramatic performance as any actor or after would, retaining certain rights and solely that performance, not in the entirety of the film. And the problem is, is that when she participates in that, yes, her performance is merged into what we'll call a unitary whole, and the producer then could use her performance delivered for that film. But the producer exceeded the scope of the license by taking her performance, which she delivered for something very innocuous, placing it into something that was so offensive to her, given her background and her values, that she never would have participated in. It's akin to an actor being asked, come and perform for a cartoon show, and the next thing you know, the actor's image is being, you know, is on a triple-X pornographic show. So your analysis is she had a license in her performance, and, I mean, she had a copyright in her performance, and she licensed that to the film, and they exceeded the license. Correct. But is the implication of your argument that every actor in every film has a copyright on their part of what they contribute to the film? I think that would be too broad, Your Honor, and here's why. I think if you look at just when someone delivers a dramatic performance, yes, a copyright is created. But you have to look at all the facts and circumstances. So is the person an employee is one test, which would revert that license to the producer in that case. Was it a work-for-hire? Is there a signed agreement? What is the scope of the license? What was the intent of the parties? So there are some circumstances where you can imagine where an actor might give a performance and not care if it was used in anything else. So you don't get the scope of the license issue unless you first found a copyright, correct? Correct. That had to be licensed. So does this theory apply to every advertisement too? It depends. If your client appears in an ad for Jell-O or for Toyota and then, you know, is paid for that and then doesn't like the ad and thinks that's not what I had in mind, can the person who was in the ad bring a copyright claim? It depends on a couple of things. First of all, it needs to be a dramatic performance or an artistic expression. Commercial speech is a bit different in that regard. And secondly, in most cases where someone performs on a – No, no, I mean, just as I understand Judge Gould's question, this would be a dramatic performance that's being used for commercial speech. I mean, commercials are little movies, right? Okay. No, I'm just – Well – I'm just trying to understand Judge Gould's question. Some of them are pretty dramatic. We would have to look at the scope of the license and the intent of the piece. Even the drama is only saying, you know, I use this face cam or, you know, this hand cam and look at my hands and all that. You know, it's a lie. I mean, you know, it's – It may not be. I mean, it's an actor or actress who – Well, okay, let's take that example. It may – you know, the message may be entirely commercial, but it's still a dramatic – Sure. Under the broad term of what dramatic means, right? So in that example, an actor, an actress, let's say she's the president of the PTA and she shows up for a commercial, for a soccer mom commercial to advertise Cheerios, and next thing you know, she's on the back page of L.A. Weekly advertising lap dances. Yeah, I think the license has been exceeded in that case because clearly when she responded to an ad for Cheerios – Just answering what I understood to be Judge Gould's question, what you would say is that is a dramatic performance, but unless it was written – I'm just – I thought the question was, was that a dramatic performance, or would they have control over this? My question is, do they have a copyright that has to be licensed? Once – yes. You sort of jump ahead to the license has exceeded. That is assuming there's a copyright in the first place. Exactly. Okay. And your answer is there is a copyright. My answer is that once the dramatic performance is affixed to a tangible medium, there is a copyright. Yes. So if there was a copyright, then I guess I'm trying to figure out why your client handed her performance to Yousef, and I don't know how that says his name, and I think your client intended him to copy and distribute it. So I'm trying to figure out how that's different from effects associates. She handed it over to be used in an adventure film for which she wanted to receive credit that had no content in it that was ultimately what was created in the work later. So it had no sexual content. It had no religious intolerance content. There was no mention of Mohammed. So how is that different than effects associates? It's different because an effects associate, the producer of the footage there, contemplated that that precise footage would be used in the film for which it was intended. And the touchstone in that case was the intent of the parties, same as in Fouad and in Otto versus Reese. When the producer then took the property, the copyrighted performance, and placed it into an entirely different performance, which did not match our client's intent, that license was exceeded and then we'd fall back in a copyright land. The issue is was there an implied license, and then what's the scope of that license and was it exceeded? An argument would be the scope of the license in this case by importing her very benign innocuous performance into what became a film that was very offensive to her, that she never would have participated in and created havoc around the world, was clearly in excess of her license. I see I have four minutes and 40 seconds. I'd like to reserve them. Thank you. Okay. We'll hear from the other side. Good afternoon. May it please the Court. Timothy Alger on behalf of Google Inc. and YouTube LLC. Are you representing Mr. Yusuf too? No, Your Honor. I don't believe he's appeared in the case. I don't believe he's been served. Oh, he has not been served. I don't believe so. So why does Google care? Why doesn't Google just pull this thing and just save themselves attorneys fees and nothing else? Because Google believes that the copyright laws apply here, and the plaintiff can't skip past the requirements of copyright infringement elements in order to get a takedown. Google doesn't takedown based on defective DMCA notices, and Google doesn't takedown at the demand of even claimed joint authors. The fact of the matter is, if there's going to be a takedown, it either has to be because there's a colorable copyright claim that meets the standards under Section 512, or it has to be something where it violates the terms of use. But even the terms of use are at Google's discretion, and Google doesn't believe that this film violates the terms of use. It made that determination. I mean, this obviously caused a great deal of grief to the plaintiff, and some danger. Why doesn't Google exercise its discretion to say, okay, well, maybe we don't have to, but we'll take it down anyway, and avoid possible harm to the plaintiff? Again, I know that lawyers don't work for free. Just save ourselves attorneys fees. Why pick this fight? Well, I think that Google and YouTube take very seriously their role as a forum for free speech. And if YouTube takes down just because of the say-so of someone that had a five-second appearance in a film like this, then where do we stop? Is it everybody that says they're pictured in some sort of a video that's been uploaded, that they say, I don't like it, it's offensive to me, and we're going to take it down? It's a little different. I mean, here they put words in her mouth that she didn't say. I mean, she says things that are quite inflammatory. I mean, it's really not sort of like, you know, there's a clip of me and it's being used in a context I didn't expect. It's really a situation where they really are making her say things she did not utter. And it would seem the kind, generous, peaceable thing to do, to say, well, we don't take down every notice, and we retain the right to, I mean, we don't take down every video. But, you know, these are circumstances where it really looks quite compelling. I mean, there seems to be no dispute about the fact that she, in fact, did not say any of these things, even as an actress. You know, never mind that it wasn't her view, but even as an actor she didn't read lines that expressed these views and made her the subject of, you know, possible death threats. I mean, wouldn't it be sort of the kinder, gentler, nicer, generous, civilized, civil thing to do, to just take it down because it's the right thing to do? Your Honor, as you know, many of the... Nothing. There's no principle preventing Google from doing the right thing, is there? Even if it doesn't have to. I think, Your Honor, it's assuming that that's the right thing. This film is a film that's garnered the attention of the globe and it's been a subject of great debate, including the issue of who's going to be the Secretary of State. There's clearly debate that goes on around the world about this video and its impact, including on the U.S. government. And I think it would be a disservice to the people to take it down. I'm surprised at your argument. It would seem to me that you'd have a better argument in suggesting that maybe removing the film from YouTube wouldn't remedy the problem. Well, Your Honor, we do point that out. I mean, where you're going seems a little cavalier, frankly. No, Your Honor, we do raise that. And I think that the preliminary injunction standard in this case is even higher because we have a prior restraint question here. And the fact of the matter is we start, Google starts, by looking at, is the claim, is the DMCA notice, the take-down notice, is it colorable? Does it meet the standards? If it's a defective notice and it's quite clear to us that the complaining party doesn't have a right under the Copyright Act, then we're not going to take it down. And that was the case here, Your Honor. Counsel, could you help me on the legal framework here? Does Google say she never had a copyright? Yes, Your Honor. Or do they say she had a copyright, but it's within the license that was given? Your Honor, our first argument is that she doesn't qualify as an author, that there's not sufficient creativity here to have her rights as an author. And what's the statutory language in the Copyright Act that that turns on? Well, we've got cases such as Community for Creative Nonviolence, Mohammed, the court said, the person to whom the work owes its origin and who superintended the whole work, the mastermind. And for the plaintiff, she wasn't even the mastermind of the five seconds that she appeared in the movie. She said she read lines from a script. She was paid $500. There was no discussion of any control. She doesn't allege that she had any control over her positioning, appearance, Does she allege she had any artistic control over the final version? No, Your Honor. She alleges nothing of the kind. This would apply to movie stars, too. I mean, they read their lines. They pay direction. So are you saying actors simply don't have an actor in a movie? I mean, the fact it's five seconds or 20 seconds or two hours would seem to make no difference at all because presumably an actor in a movie, unless it happens to be an actor who also is a director or something, or the producer really is the author of the movie, right? It wouldn't matter how long a role it is. Well, I don't know whether that's true, Your Honor. I think the substantial contribution of the author very well might play into whether they're an author or not. I think of improvisational work. You can think of Robin Williams, who's known for many years. There's improvisational work in movies and on television where the actor brings something special. It's not just reading lines. Where the actor is emoting, has pathos, is carrying the role forward. Your Honor, time is limited, so I won't debate that with you. Let's just take all the situations where the actors just read their lines. Whether they read their lines or not, the expressions they bring to it, how quickly they read them, how slowly they read them, how they look to the camera. All those things are judgments and talents that are brought to bear by the actor. So if you're saying ad-libbing is creativity enough, surely sort of a wink of the eyebrow, whether you look sideways at the camera or you look straight at the camera, all those things. How is that different from ad-libbing? How can you divorce an actor's actions, facial expressions, stance, the way their hair is combed, all the things like that from the spoken words? Those are facts that might be relevant to a determination like that, but we certainly don't have that here. Then we're out of summary judgment land. Now you're talking about trials. If you're saying she gets a trial on this issue, then that's cool. Perhaps, but we're here on a motion for a preliminary injunction that was denied, and there's an abuse of discretion standard here. And the question here is, is a court going to order a takedown of speech that's clearly a matter of public concern based on a very attenuated claim for five seconds in which she was overdubbed? In fact, in her complaint, she contends that her appearance in the movie was grotesquely different than what she presented. So how can someone who claims that, on one hand, that it's the presentation in the movie, her incorporation into this single unitary work, is grotesquely different than what she gave? She gets a sole authorship of something that's very different than what she actually performed, and the court ends up saying, if she's correct, the court orders a takedown of something that's undeniably a matter of great public debate. Now, that seems to me that that's real suppression of valuable speech. And we need to have something more than five seconds reading a line that's been overdubbed. Now, granted, it's difficult to say, well, where's the dividing line? Where do we say, okay, this contribution by an actor becomes something where that actor is an author, or it's a joint work, absent a contract. We don't have that here, Your Honor. We've got something where we've got the plaintiff who had five seconds. There's no emoting. If the court has looked at the clip, the words have been overdubbed. She says that she read a script that Nakula gave to her. She didn't have any control, any influence over her presentation, no control over the ultimate use. And even if it's copyrightable, then we move into the effects case, and we move into the implied license. And so even if she has a copyrightable contribution, then we have to analyze the question, when giving this copyrightable contribution, did she intend it to be incorporated into this work? And in that case, was there an implied license created? And we think that the court doesn't need to go that far, but if necessary, the court can go that far and say, you know, it was only fixed, as opposed to effects, where there was a fixation of this clip, the special effects, separate and apart from the movie. Here we've got a situation where her performance doesn't occur but for the fixation that's in dispute. Can't you say, look, the license was that I appear in the movie with my words as I spoke them, and the movie being as it was represented to be, not something else altogether where I'm made to speak words that I didn't say. If you're talking about an implied license, I mean, this is where people get actual licenses. Well, Your Honor, if that's the rule, then the actual author, the sole author, loses all control over the work. As Your Honor wrote in the concurrence in the Fode case, the author can't be deprived of his control over the work simply because there's an implied license. You're entitled to make derivative works. You're entitled to modify the work and develop it. Otherwise, the author loses all control, and then we have all these folks, including extras, everybody that helped on a movie in any regard, has a challenge, has a claim that they have a copyright in the movie. And we open ourselves up to... Let me ask you a question on the theory on that. So let's assume, for sake of argument, that in the past week I saw a TV show called Downton Abbey. There's a bunch of actors in it. Do they all have copyrights in their performance? Well, I believe that most... I would assume that most of them have signed releases, so that's why it's not usually... Assuming they haven't signed a release. Before we get to the release, we have to first find there's a copyright, right? Yes, Your Honor. Then a license, and then you look at a release. But on the question whether there's a copyright in the first place, it's kind of what I am primarily focused on now as to whether every actor in every movie, every TV show, every commercial has a copyright in what they've presented. I don't believe so, Your Honor. Because I think that would just eviscerate the Copyright Act. We've got sole authors, and we have joint authors. And I don't think the Copyright Act anticipates that everybody that has some role in the creation of a work suddenly becomes a joint author. And the plaintiff is going even further and saying that she has a sole authorship in a sliver of that film. And there's no authority for that proposition at all. So we've got the cases all anticipate, in Al-Muhammad, by this court, they anticipate there's going to be many contributors to a film. It takes hundreds and hundreds of people to put together a film or Downton Abbey. And that these people are all contributed to the work, but there's a sole, single author, a single owner of that work, absent contract or absent some factual showing that they both intended, or the multiple parties involved, intended to be joint authors. And we don't have that here. In fact, the plaintiff doesn't even contend that this is a joint work because there's no evidence of intent to have a joint work, and it wouldn't help her do a takedown because she acknowledges that Mr. Nakula actually uploaded the clip. So we don't have a contention of joint authorship. Instead, we've got a contention that you can take this film and slice it up into tiny little segments, and everyone that participated in the film gets a tiny little sliver. And it would be unmanageable to expect that the Copyright Act gives all the folks that participate in Downton Abbey, including the people that do the costuming, the people that make sure the gardens are groomed properly, the various actors, the people in the background, all those people have some sort of a copyright interest in their creative contribution. Is the only issue that's before us on the preliminary injunction the question of copyright? Is that the only ground for likelihood of success to sustain an injunction, or were there also state law claims or other claims? The only claims against Google and YouTube were copyright claims. There are other pendent state claims, but they're against Mr. Nakula who hasn't made an appearance in the case. Okay, thank you. Thank you, Your Honor. Thank you. Your Honor, on the issue of Downton Abbey, every person who commits writing to paper and creates part of script pages, and every actor who performs on film and when their performance is fixed to a tangible medium, becomes the owner of the copyright. That is the purpose of the Copyright Act, is to protect those people and to encourage the artistic expression. Do I do that in the whole work? No, in their individual contribution, as Your Honor wrote, in effects, where a non-employee contributes to a book or movie, as effects did here, the exclusive rights of copyright ownership vest in the creator of the contribution, unless there's a written agreement to the contrary. Now I bet with Downton Abbey, all of those script writers and actors have probably signed agreements, so there are writings to the contrary under Section 101, Sub 1 of the Copyright Act, which says that it can become a work for hire when you're dealing with an audiovisual work and each of the contributors does sign a work for hire agreement. I'm going to guess that that studio probably did all of that. But in the absence of that, in the absence of a writing, each contributor, as it says in effects, owns their individual copyright contribution. And that then is to be measured against an implied license. So if, say, someone in Downton Abbey slipped through the cracks, they wrote some script pages, it got on screen, they may own that, but presuming they handed it to the producer of Downton Abbey, there's an implied license there. Now if that script page gets taken and put into a wholly separate property, it's probably going to be in excess of the scope of the license. And that's what happened here. She participated in film A. Her performance was taken and put in film B, something she never would have consented to and was clearly not to the intent of her at the time. When we get past the license issue, you still have a mountain to climb. I mean, assuming you succeed on that. I mean, for one thing, you've got a... I mean, you're seeking a permanent injunction. We have to find abuse of discretion. We have to look at a number of questions. One of them being, this is not really... I mean, the thing that makes your client's case compelling for an injunction doesn't have anything to do with copyright harm. It's an entirely different kind of harm. That's correct. It is not the usual case where you have the Copyright Act and then you're seeking a remedy under the Copyright Act for infringement. What you're seeking here is what makes it compelling. It has nothing to do with the Copyright Act. This is even the kind of harm that can be considered in deciding whether to issue a copyright injunction? No, and I think the point Your Honor makes is absolutely correct. In Perfect Ten, this Court noted that you could no longer presume irreparable harm straight from copyright infringement. There had to be something more. But it was silent as to what that something more was. In that case, the plaintiff didn't meet the burden because they were already going into bankruptcy, so the infringement didn't further push them into bankruptcy. In this case, we have a clear-cut case where we have a woman who's an actress, who's an ordained minister, who was not under threats of any harm or death or rape or harm to her family or those around her. This heinous piece gets published on YouTube, gets millions and millions and millions of views, and next thing you know, she's under a FATWA, under fear of death. Well, I guess that's my worry. When we're looking at all the factors that we have to evaluate, even if I would suggest there's any likelihood of success, the likelihood of irreparable harm if injunctive relief is not granted is some worry to me because I'm having trouble finding why, at this point, removing the film from the YouTube would remedy the alleged problem. Understood, Your Honor. And I would direct Your Honor to excerpt of record, page 253, which is paragraph 25 of Professor Abu El-Fadl's declaration, in which he says two important things. Number one, her five-second performance or nine-second performance, albeit how brief it was, where she calls a prophet Muhammad a child molester and a sexual deviant, goes to the very heart of the message of the film. That's number one. Number two— But that doesn't have anything—you're not answering my question. Even if they pull this film, how does that remedy the alleged potential harm? When I looked into what there is in this record, I couldn't find it. So I thought, as Perfect Ten suggests, the injunction won't turn back time. It won't put the toothpaste back in the tube. And, frankly, therefore, the likelihood of harm does not weigh in your client's interest. No one can guarantee that, but Professor— Nobody can guarantee it, but there's got to be something in the record that's even suggested. Your Honor, I would direct your attention to Professor Abu El-Fadl's declaration. He states that it is her efforts to distance herself publicly from this film her efforts to attempt to disable the content that may very well be keeping her alive. Those are his words. He's a counterterrorism expert. He's a Middle Eastern expert. He's world-renowned. Unless—I wish I had the declaration of the Salafist sheik cleric that would say, gee, if we get this content down, we won't want to kill her anymore and we'll tell everybody. But he obviously wasn't that available. Well, the problem isn't that you get that declaration. The problem is that the film was published, the film having been published, and being, frankly, being something that everybody's looked at and everybody's done what they need to do with, they're not going to forget. And so, therefore, the injunction taking it off, how does it weigh in your interest? That's the question. She has a right to have peace of mind, to be distanced from this. As the Court said in Michaels v. Internet Entertainment, there is a human dignity issue and a peace of mind issue, and she also has a right under the copyright law to control the artistic expression of her performance, which has gotten out of the gate, yes, but she continues to have that right. And the longer it's in place, she's got children, grandchildren, people she wants to do business with. As long as it stays up, it denigrates her reputation and her profession. Thank you. Has this not been replicated? There's nothing in the record to show it's playing anywhere else other than the 171 URLs on YouTube. We don't have any evidence in the record of any other replication. I suspect people may have individually downloaded it, but there's nothing in the record to suggest that. Okay. Thank you, Your Honors. Okay. Thank you. The case is argued with ten minutes. We are adjourned.
judges: Kozinski, Gould, Smith